

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN 11

**GROVER SELLERS**
ATTORNEY GENERAL

Honorable Claude Isbell
Secretary of State
Austin, Texas

Dear Sir:

Opinion No. O-6375

Re: Under the given facts does
the Secretary of State have
the power and authority, and
is it his duty, to approve
and file a charter for an
association to be organized
under the Co-operative Mar-
keting Act?

We duly received your request for an opinion on the above matter, said request reading as follows:

"The Farmers Supply Company of Hartley, Texas, is an agricultural co-operative marketing associa- tion organized under the provisions of Chapter 8 of Title 93 of the Texas Revised Civil Statutes.

"The purpose clause as stated in its charter is as follows:

"'The purpose for which this corpora- tion is organized is to engage in any ac- tivity in connection with the marketing or selling of the agricultural products of its members, or with the harvesting, preserving, processing, packing, storing, handling, ship- ping, or utilization thereof, or the manufac- turing or marketing of the by-products there- of; or in connection with the manufacturing, selling or supplying to its members of ma- chinery, equipment, or supplies, or in the financing of the above enumerated activities; or in any one or more of the activities here- in specified.'

"'This corporation shall have and enjoy all of the powers granted by the Cooperative Marketing Act of Texas, as amended, or which may hereafter be amended.'

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Honorable Claude Isbell, page 2

"On March 17, 1945, the Farmers Supply Company
of Hartley, Texas, acting through their attorneys,
Underwood, Johnson, Dooley and Wilson, of Amarillo,
Texas, filed with this office a proposed amendment
to the charter of the said co-operative which in
part sought to amend the purpose clause of the said
charter so that it would hereafter be as follows:

"'The purpose for which the said as-
sociation is organized is to engage in
any activity in connection with the mar-
keting or selling of the agricultural prod-
ucts of its members, or with the harvest-
ing, preserving, processing, packing, stor-
ing, handling, shipping, or utilization
thereof; or in connection with the manufacturing,
selling or supplying to its members of ma-
chinery, equipment or supplies, or in the
financing of the above enumerated activities;
or in any one or more of the activities spec-
ified herein; provided said association may
further conduct a public warehousing busi-
ness, including warehousing in compliance
with the applicable statutes, state and fed-
eral, relative to the conducting of state or
federally bonded warehouses. This association
shall have and enjoy all of the powers granted
by the Co-operative Marketing Act of Texas, as
amended, or which may hereafter be amended.'

"Emphasis, which contains the matter added to the
purpose clause as it now exists, is mine.

"On March 20, 1945, the office declined to file this
amendment due to the fact that we could not find any
statutory provision which would, in our opinion, authorize
a Co-operative Marketing Association to engage in the busi-
ness of operating a public, state or federally bonded ware-
house.

"On April 17th, the above-mentioned law firm, acting
by and through R. A. Wilson, wrote us a letter to the ef-
fect that our action in declining to file the proposed
amendment was contrary to the requirements of the State
Department of Agriculture, and to the rulings of prior
Heads of the Charter Division of this office.

"Will you please, therefore, favor us with your opin-
ion in regard to the following questions:

"'Does the Secretary of State have the power
and authority, and is it his duty, to ap-
prove and file a charter for an association to
be organized under the Co-operative Marketing
Act, which is in all things regular on its
face, other than that it has included in its
purpose clause the operating and maintaining
of a public warehousing business?

"'Would your answer to the above question be
different if the question involved an amend-
ment to an existing charter rather than a new
charter?'"

As to the rules governing the purposes for which a cor-
poration may be chartered, there is laid down in 10 Tex. Jur.,
Sec. 32, pp. 624-5, the following:

"In connection with the statement of the pur-
poses of the corporation, the principal proposition
is that the scope of the purposes enumerated in the
statutes must not be exceeded. The general authority
to incorporate a corporation organized for 'mutual
profit or benefit' having been repealed, it is con-
sidered to be the policy of the Texas law to limit
the rights of incorporation to the specific purposes
authorized by statute. . ."

In the case of Smith et al vs. Wortham, Secretary of
State, 157 S. W. 740, the Supreme Court had under consideration
a case where it had been asked to require the Secretary of State
to approve the application for a corporate charter of the Dallas
Automobile Club Building Association, and in which it laid down
the following rules:

"The authority of this court to compel by man-
damus the performance by the Secretary of State of
an official act exists only in those instances where
he is under a clear legal duty to perform the par-
ticular act. Judicial revision of his action in re-
jecting a charter of a corporation tendered for ap-
proval on account of its purpose clause is not jus-
tified unless the purpose named is clearly authorized
by law."

The Farmers Supply Company of Hartley, Texas, was orig-
inally chartered under Chapter 8, Title 93 of Vernon's Annotated
Civil Statutes, Article 5763 of which is in part as follows:

Honorable Claude Isbell, page 4

"The provisions of the general corporation
laws of this State, and all powers and rights there-
under shall apply to associations organized here-
under except when in conflict with the provisions
of this chapter. . ."

10 Tex. Jur., Sec. 32, p. 625, lays down a further rule
as follows:

". . . A further rule is that the filing of
a charter stating purposes embraced in more than
one subdivision of Article 1302 is unauthorized.
. . . Furthermore, one subdivision may not be
construed to authorize two independent businesses."

In the case of Ramsey et al vs. Tod, Secretary of State,
69 S. W. 133, the Supreme Court was considering a petition for a
writ of mandamus to compel the Secretary of State to file a charter
under certain statutes therein mentioned, and in refusing such pe-
tition it was held as follows:

"Considering these provisions together, we
are of the opinion that it was the intention of
the legislature to authorize a corporation to be
formed for any one or more of the purposes as spec-
ified in any one of the subdivisions, and not for
two or more purposes as designated in two or more
subdivisions. Section 4 throws no light upon the
question. As to this matter, language could hardly
have been employed which would have been more in-
definite. The words 'private corporations may be
created * * * for the purposes * * * mentioned in
the following sections,' may mean literally that a
corporation may be formed for one of the purposes
only, or for any one or more of the purposes, or for
all of the purposes mentioned in the section. So
the language in section 5, 'the purposes for
which corporations * * * may be formed are,' is
equally indeterminate. But when we come to con-
sider the requirements as to the contents of the
charter as prescribed in section 6, the legislative
intent becomes more apparent. One of these is that
the charter must state 'the purpose' for which the
corporation 'is formed'. For the reason that if
it had been intended that a corporation might be
created for two or more of the purposes specified
in the preceding section, it would have been ap-
propriate to have said 'the purpose or purposes
for which it is formed', the use of the word 'pur-
pose' in the singular number tends strongly to show
that it was the intention of the legislature to

Honorable Claude Isbell, page 5

authorize the creation of a corporation for only one purpose, or for two or more of the purposes mentioned in one subdivision. It may be true that the use of the singular number may not be conclusive of the question, and that, if there were other provisions in the act which, either by express declaration or clear implication, indicate that it was intended to authorize an incorporation for two or more of the designated purposes, whether in the same subdivision or not, we should so hold. But no provisions in the act which show satisfactorily such intention have been pointed out, nor have we found any. On the contrary, the structure of section 5 tends to show that it was only one purpose that was to be mentioned in the charter. If such was not the intention, why did the legislature specify each purpose in a separate subdivision of the section, and number them from 1 to 27, successively? It is at least suggestive that two purposes, when not embraced in the same subdivision, were not to be conjoined in a charter, but that they were to be severed, and one alone adopted.

"Further, in this connection it is to be noted that we are not dealing with a hastily prepared legislative enactment. Unlike many others, the statute under construction is comprehensive in its scope, elaborate in its details, and bears evidence upon its face that it was thoroughly considered and carefully prepared by a person or persons learned in the law. In such a statute the designation of the purposes for which corporations were authorized to be created in numbered subdivisions, together with the provisions that the charter should set forth 'the purpose for which it is formed', ought, in the absence of provisions indicating a different intent, to be deemed to show that the legislature had in mind the creation of a corporation for one of the purpose or purposes specified in one subdivision only."

In the case of Johnston et al vs. Townsend, Secretary of State, 124 S. W. 417, the Supreme Court was considering an application for a mandamus to compel the Secretary of State to file a charter of incorporation, which he refused to do on the ground that it was for the formation of a corporation for two purposes, which, he contended, could not be combined in one charter. The contention was also made that the court had held in case of Ramsey vs. Tod, supra, that charters are authorized without limitation for all the purposes mentioned in any one subdivision of the statute. In refusing said application, the court held as follows:

Honorable Claude Isbell, page 6

"A charter must specify the purpose for which
the corporation is to be created. This should be
done with sufficient clearness to enable the Sec-
retary of State to see that the purpose specified
is one provided for by the statute, and to define
with some certainty the scope of the business or
undertaking to be pursued. The charter tendered
in this case is so general and indefinite in its
language that while it might apply to one business,
such as we have mentioned, consisting of both man-
ufacturing and mining, with the purchase and sale
of goods, etc., used for it, it might also be taken
to authorize the transaction of two businesses, one
of manufacturing and another of mining, with the
further power of purchase and sale incident to each,
And it appears to be the purpose of the relators to
use the charter for the carrying on of what we re-
gard as two distinct businesses. We may look to
this as illustrative of the capacities for use of
that which it is sought to have the respondent
file, although we do not think that questions as
what may be done under a charter ordinarily arise
when it is proposed to have one filed. It is
proper and important to see that the purpose of a
charter is so expressed as to carry out the intention
of the Legislature in making that requirement; for
it is by a compliance with it that the public, as
well as those specially interested in corporations,
are to be protected against the assumption of powers
not granted. It appears from the petition that the
relators who are also the proposed corporators have
heretofore acted as partners in mining for oil, gas,
and water, and have manufactured their own tools and
equipment and devices used in that business, and
have invented and received patents on some which
were new. They have been able to manufacture more
of these than they have needed in doing their own
work, and have been engaged in selling them, and
the manufacturing business which they wish to
incorporate is that of making these tools, devices,
etc., for sale to others. Such manufacturing has
heretofore been a part of the business which, as
individuals, they had a right to conduct, but it by
no means follows that it with all else that is pro-
posed for the corporation is only one business of
mining and manufacturing such as one corporation
may follow. It seems plain that the business of
manufacturing for sale, tools, etc., for mining

is as distinct from the business of mining as the business of manufacturing for sale farming implements would be from farming.  In order to hold that the statute allows the incorporating for two such purposes, we should have to hold that it authorizes the incorporation of one company for distinct businesses of manufacturing and mining, which as we have already said, is not true.  And, as the charter offered can be interpreted as meaning and is intended to mean that it authorizes the pursuit of both businesses, we think the respondent had the right under the law to refuse to file it until the doubt as to its scope should be removed by a more specific statement of the purpose.

"As we have before indicated, relators reply on some expressions in the opinion in Ramsey v. Tod, for their contention that charters are authorized without limitation for all the purposes mentioned in any one subdivision of the statute.  What was really held was that the subdivision of the statute showed the legislative intent that there should be no uniting of purposes mentioned in different subdivisions, although related to each other, and only those mentioned in the same subdivision were capable of being joined in one charter.  It certainly was not meant that all of those mentioned in any subdivision could be united in every case, regardless of the way in which they might be related to or connected with each other.  It will be seen that the effort in that case was to incorporate businesses which would have had a close and natural connection with each other, viz.:  (1) 'The purchase and sale of goods, wares and merchandise, and agricultural and farm products'; and (2) 'the accumulation and loan of money in carrying out said purpose'.  It thus appears that the latter purpose would have been wholly dependent on the results of the first.  The holding was that because of the fact that these purposes were treated by the statute as separate they could not be made one as sought, notwithstanding the dependence of one upon the other.  With this in mind, it is easy to understand what was said as to those purposes mentioned together in the subdivisions.  They were treated by the statute itself as if they could be united and hence they may be; but this does not mean that they must be held in every instance to constitute 'a business' the transaction of which is 'the purpose' of the incorporation, although wholly

Honorable Claude Isbell, page 8

distinct from and unrelated to each other. The court in Ramsey v. Tod had no occasion to determine the conditions essential to incorporating when only those things mentioned in a single subdivision were in question. We have endeavored to show how mining and manufacturing may be combined under subdivision 14 and restrict our decision to that."

Under the above well-defined rules, it is our opinion that authority for the filing of the proposed amendment to the charter of the Farmers Supply Company of Hartley, Texas, must be found under Chapter 8, Title 93, V. A. C. S., or it will have to be refused.

The declared policy of the State in regard to co-operative marketing associations authorized by Chapter 8, Title 93, is set forth in Article 5737 in the following language:

"In order to promote, foster and encourage the intelligent and orderly marketing of agricultural products through co-operation and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; and to stabilize the market problems of agricultural products, this law is passed."

Article 5740 of said statute, as amended, Acts 1943, 48th Leg., p. 601, Chap. 346, which sets forth the purposes for which such an association may be organized, reads as follows:

"An Association may be organized to engage in any activity in connection with the production, cultivation and care of citrus groves or the marketing or selling of agricultural products and citrus fruits produced by and marketed for its members, or in the harvesting, preserving, drying, processing, canning, storing, handling, shipping or utilization thereof, or the manufacturing or marketing of the by-products thereof; or in connection with the manufacturing, selling or supplying to its members of machinery, equipment or supplies; or in the financing of the above-enumerated activities; or in any one or more of the activities specified herein. Provided, however, any such activities may extend to nonmembers and to the production, cultivation and care of lands owned or cultivated by them and their products limited by Article 5738 as heretofore amended."

Honorable Claude Isbell, page 9


Article 5738 of said statutes, which limits the provisions of Article 5740, is as follows:

"(a) The term 'agricultural products' shall include horticultural, viticultural, forestry, dairy, live stock, poultry, bee, and any farm and ranch products; (b) the term 'member' shall include actual members of associations without capital stock and holders of common stock in associations organized with capital stock; (c) the term 'association' means any corporation organized under this Act or any association organized under the co-operative marketing acts of any other State of the United States; provided, such foreign association is composed of persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers, acting together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling and marketing in interstate and foreign commerce, such products of persons, so engaged; provided, further, that such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements:

"(1) That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or

"(2) That the association does not pay dividends on stock or membership capital in excess of eight per centum per annum, and in any case to the following:

"(3) That any association shall be permitted to deal in the products of non-members to an amount not greater in value than such as are handled by it for its members; and (d) the term 'person' shall include individuals, firms, partnerships, corporations and associations. Associations organized hereunder shall be deemed non-profit, inasmuch as they are organized not to make profits for themselves, as such, or for their members, as such, but only for their members as producers. This Act shall be referred to as the 'Co-operative Marketing Act.'"

The powers of associations incorporated under this Act are set forth in Article 5742 as follows:

Honorable Claude Isbell, page 10

"Each association incorporated under this Chapter shall have the following powers:

"(a)  To engage in any activity in connection with the production, cultivation and care of citrus groves and the marketing, selling, harvesting, preserving, drying, processing, canning, packing, storing, handling or utilization of any agricultural products produced or delivered to it by its members, or the production, manufacturing or marketing of the by-products thereof; or in connection with the purchase, hiring, or use by its members of supplies, machinery or equipment; or in the financing of any such activities; or in any one or more of the activities specified in this Article.

"(b)  To borrow money and make advances to members.

"(c)  To act as the agent or representative of any member of members in any of the above-mentioned activities.

"(d)  To purchase or otherwise acquire, and to hold, own and exercise all rights of ownership in, and to sell, transfer, or pledge shares of the capital stock or bonds of any corporation or association engaged in any related activity or in the handling or marketing of any of the products handled by the association; including the power to subscribe, pay for and own the capital stock of Banks for Cooperatives organized under the 'Farm Credit Act of 1933' passed by the Congress of the United States and approved June 16, 1933.

"(e)  To establish reserves and to invest the funds thereof in bonds or such other property as may be provided in the by-laws.

"(f)  To buy, hold and exercise all privileges of ownership over such real or personal property as may be necessary or convenient for the conducting and operation of any of the business of the association or incidental thereto.

"(g)  To do each and everything necessary, suitable or proper for the accomplishment of any one of the purposes or the attainment of any one or more of the objects herein enumerated; or conducive to or expedient

for the interest or benefit of the association; and to
contract accordingly; and in addition to exercise and
possess all powers, rights and privileges necessary
or incidental to the purposes for which the association
is organized or to the activities in which it is en-
gaged; and in addition, any other rights, powers and
privileges granted by the laws of this state to or-
dinary corporations except such as are inconsistent
with the express provisions of this Act; and to do
any such thing anywhere.

"(h) To extend its activities to the products and
supplies of non-members to an amount not greater in
value than such as are handled by it for its members."

Article 5664 of said statutes defines "warehouseman" as
a person lawfully engaged in the business of storing goods for
profit.

Article 5568 sets forth the conditions under which any
person, firm, company, or corporation shall be deemed and taken
to be public warehousemen, as follows:

". . .

"Any person, firm, company, or corporation who
shall receive cotton, wheat, rye, oats, rice, or any
kind of produce, wares, merchandise, or any personal
property in store for hire, shall be deemed and taken
to be public warehousemen."

Chapter 3, Title 93, authorizes the formation of a co-
operative association (Art. 5578), one of the powers of which is
that of a warehouseman, (Art. 5579) and Chapter 4 of said Title
authorizes the issuance of warehouse receipts, Art. 5561 thereof
setting forth who may become a public warehouseman and the re-
quirements therefor; but, under the rules above laid down, the
Farmers Supply Company of Hartley, Texas, is not authorized to
take advantage of such provisions and to amend its charter
thereunder, since it was organized and has been operating under
Chapter 8 of said Title, which is a different law. There being
no provision in Chapter 8, Title 93, authorizing the issuance of
a charter containing the purpose clause set forth in said proposed
amendment, viz: "provided said association may further conduct a
public warehousing business, including warehousing in compliance
with the applicable statutes, state and federal, relative to the

conducting of state or federally bonded warehouses," it is our opinion that said proposed amendment should be refused. This would be true without regard to whether the question involved an amendment to an existing charter, or a new charter.

Trusting this satisfactorily answers your inquiry, we remain,

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By Jas. W. Bassett
Jas. W. Bassett
Assistant

JWB/JCP

